PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

J.S., a minor, by his mother Sharon
Duck,
          *Plaintiff-Appellant,*

          and

SHARON DUCK,
                    *Plaintiff,*

          v.                                    No. 03-2446

ISLE OF WIGHT COUNTY SCHOOL
BOARD; MICHAEL W. MCPHERSON,
Superintendent of the Isle of Wight
County Schools; TED DURNIAK,
Director, Special Education, Isle of
Wight County Schools,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Tommy E. Miller, Magistrate Judge.
(CA-03-53-2)

Argued: September 30, 2004

Decided: March 30, 2005

Before MICHAEL and DUNCAN, Circuit Judges, and
Roger W. TITUS, United States District Judge for the
District of Maryland, sitting by designation.

Reversed in part, affirmed in part, and remanded by published opin-
ion. Judge Duncan wrote the opinion, in which Judge Michael joined.
Judge Titus wrote a concurring opinion.

**COUNSEL**

John Warren Hart, BEATON & HART, P.C., Virginia Beach, Virginia, for Appellant. Kevin Joseph Cosgrove, HUNTON & WILLIAMS, Norfolk, Virginia, for Appellees.

---

**OPINION**

DUNCAN, Circuit Judge:

J.S. and his mother, Sharon Duck, sued the Isle of Wight County (Virginia) School Board, superintendent, and special education director, alleging violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 42 U.S.C. § 1983. The plaintiffs sought equitable and monetary relief on the grounds that the defendants failed to provide J.S. with special education services while he was a student at Carrsville Elementary School. The defendants conceded liability for violating the IDEA and entered into an agreement with the plaintiffs resolving all claims under this statute. The district court granted summary judgment for the defendants on J.S.'s claims under the Rehabilitation Act and § 1983.[1] We affirm the order granting summary judgment on J.S.'s § 1983 claim. However, we reverse the award of summary judgment as to his claim under the Rehabilitation Act and remand this case for proceedings consistent with this opinion.

I.

J.S. was born on May 4, 1989. In September 1994, he started kindergarten at Joseph P. King Elementary School ("J.P. King") in Franklin City, Virginia. In November 1994, Mrs. Duck grew con-

---

[1]Pursuant to the Federal Magistrate Judge Act, 28 U.S.C. § 636(c)(1), and Rule 72 of the United States District Court for the Eastern District of Virginia, this case was referred to a federal magistrate judge for a final decision on August 12, 2003. For ease of reference, we refer to the proceedings below as the "district court" proceedings.

cerned about J.S.'s progress in kindergarten and requested that the school evaluate J.S. for a possible learning disability. After several evaluations, the school determined that J.S. was a disabled child eligible to receive special assistance in the classroom.

In July 1996, after J.S. completed his first grade year at J.P. King, the school prepared an Individualized Education Program ("IEP") to commence when J.S. began the second grade in September 1996.[2] Mrs. Duck participated in the preparation of J.S.'s IEP and agreed to accept the special education services offered by the school. J.S. nevertheless struggled through the second grade. As a result, J.S.'s teachers and Mrs. Duck formulated a new IEP and agreed that J.S. would repeat the second grade for the 1997-1998 school year. After successfully completing the second grade, J.S. began the third grade at J.P. King in September 1998. The parties disagree as to whether the Franklin City Schools implemented an IEP for the 1998-1999 school year. Although Mrs. Duck contends that J.S. had an IEP for the third grade, no record of an IEP was produced in the district court.

After his third grade year, J.S. and Mrs. Duck moved to Isle of Wight County. On August 17, 1999, Mrs. Duck completed a registration form to enroll J.S. in the Isle of Wight County Schools. The form asked "Has this child been identified for Special Education, Gifted and Talented Programs, or Alternative Education Programs?" J.A. at 102. Mrs. Duck checked the box indicating "yes" on the registration form. In addition, someone wrote the phrase "1997 Special Ed." below the "yes" box on the registration form, apparently to indicate that J.S. had last been enrolled in an IEP for the 1997-1998 school year. Mrs. Duck, however, denies that this was her handwriting.

In September 1999, when J.S. started the fourth grade at Carrsville

---

[2]In accordance with the IDEA's mandate that states guarantee all children with disabilities "a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A), "[t]he IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Association for Cmty. Living in Colorado v. Romer*, 992 F.2d 1040, 1043 (10th Cir. 1993).

Elementary School, there was no IEP in place, and he was not enrolled in any special education classes. In October 1999, Mrs. Duck observed that J.S. was having trouble in school, and she requested a meeting with school officials. On November 12, 1999, the principal, special education coordinator, and several teachers met to discuss J.S.'s performance in school. Mrs. Duck could not attend the meeting, but she sent J.S.'s grandmother to attend in her place. At the meeting, the school representatives indicated that J.S. was doing somewhere between "OK" and "fair" in the regular classroom without special assistance. Accordingly, they decided that J.S. would not be placed in special education classes. Mrs. Duck did not agree with this decision, but the defendants failed to notify Mrs. Duck of her right to an appeal. As a result, Mrs. Duck did not challenge the November decision.

During J.S.'s fifth grade year, Mrs. Duck requested that the school evaluate J.S. to determine whether he could receive special education assistance. Her efforts to have J.S. tested, however, proved unsuccessful. In September 2001, J.S. entered the sixth grade at Windsor Middle School. After his schoolwork continued to suffer, J.S. was evaluated and the school determined that he was learning disabled and therefore eligible to receive special education services. Mrs. Duck and the school thereafter formulated an IEP, and J.S. was placed in special education classes beginning in the summer between sixth and seventh grade.

On January 17, 2003, Mrs. Duck filed a complaint in the United States District Court for the Eastern District of Virginia, asserting claims against the defendants for herself as well as J.S.. The Complaint alleged that the defendants denied J.S. a proper education by not providing him with special education services for the three years that he was a student at Carrsville Elementary School—namely, from the fourth through the sixth grade. Count I of the Complaint asserted a violation of the IDEA on the grounds that (1) an IEP was allegedly in place with the Franklin City Public Schools when J.S. transferred to Carrsville Elementary School for the fourth grade, and (2) the defendants were therefore obligated to confirm that J.S. was no longer a child with a disability before terminating his special education services.[3] Count II alleged that the defendants discriminated against

---

[3]In relevant part, the IDEA provides that "a local educational agency shall evaluate a child with a disability in accordance with this section before determining that the child is no longer a child with a disability." 20 U.S.C. § 1414(c)(5)(A).

J.S.[4] on the basis of his disability in violation of the Rehabilitation Act.[5] Finally, Count III asserted a violation of the plaintiffs' civil rights under 42 U.S.C. § 1983.

On the grounds that no record of an active IEP existed when J.S. transferred to Carrsville, the defendants answered and denied that they were obligated to determine his eligibility for educational assistance. Nevertheless, the defendants admitted that they violated the procedural requirements of the IDEA by failing to inform Mrs. Duck of her right to appeal the school's determination that J.S. would not be placed in special education classes.[6] The parties subsequently resolved Count I of the Complaint, with the defendants agreeing both to comply with all applicable provisions of the IDEA, and to pay the costs and attorney's fees associated with the plaintiffs' claims under the IDEA.

The defendants moved for summary judgment, however, on Count II of the Complaint. Specifically, the defendants observed that the Rehabilitation Act does not contain a statute of limitations, and that the federal "borrowing" doctrine therefore requires the selection of the most analogous statute of limitations under state law. *See Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985). The parties agreed that the one-year limitations period provided by the Virginia Rights of Persons

---

[4]Count II of the Complaint was filed in J.S.'s name only, while Counts I and III sought relief for both J.S. and Mrs. Duck.

[5]Section 504 of the Rehabilitation Act provides that:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). There is no dispute that Carrsville Elementary School received federal financial assistance at all times relevant to these proceedings.

[6]The IDEA required the defendants to provide Mrs. Duck with a "procedural safeguards notice," explaining her right to appeal the determination that J.S. was not eligible to receive special education assistance. 20 U.S.C. § 1415(d)(1)&(2).

with Disabilities Act, Va. Code Ann. § 51.5-46(B) (Michie 2004), was most applicable to federal claims under the Rehabilitation Act. The defendants contended that under the borrowing doctrine, J.S.'s claim under the Rehabilitation Act was subject not only to the one-year limitations period provided by the Virginia statute, but also to the requirement in the statute that plaintiffs provide written notice of a claim to the defendant within 180 days of the alleged discriminatory practice. *Id.*[7] J.S. did not provide the defendants with written notice of his claim under the Rehabilitation Act within 180 days of the determination that he would not receive special education services. Thus, the defendants argued that J.S.'s non-compliance with the notice provision in the Virginia statute required the dismissal of his Rehabilitation Act claim.[8] The district court agreed and accordingly granted the defendants' motion for summary judgment on Count II of the Complaint. The district court also granted summary judgment for the defendants on Count III, holding that under our decision in *Sellers v. School Board of Manassas*, 141 F.3d 524 (4th Cir. 1998), the plaintiffs' claims under § 1983 were nothing more than a prohibited attempt to recover money damages for a violation of the IDEA.

J.S., through Mrs. Duck, now appeals the dismissal of his claims under the Rehabilitation Act and § 1983.[9]

---

[7]In pertinent part, the Virginia statute provides that:

An action may be commenced pursuant to this section any time within one year of the occurrence of any violation of rights under this chapter. However, such action shall be forever barred unless such claimant or his agent, attorney or representative has commenced such action or has filed by registered mail a written statement of the nature of the claim with the potential defendant or defendants within 180 days of the occurrence of the alleged violation.

Va. Code Ann. § 51.5-46(B).

[8]The statute of limitations was tolled during the period of J.S.'s infancy. Va. Code Ann. § 8.01-229(A)(1) (Michie 2004). Thus, there is no dispute concerning J.S.'s compliance with the applicable limitations period.

[9]Mrs. Duck does not appeal any judgment of the district court with respect to her claims.

II.

We review de novo the order granting summary judgment on Counts II and III of the Complaint. *Coons v. Secretary of the Treasury*, 383 F.3d 879, 884 (9th Cir. 2004). Viewing the evidence in the light most favorable to J.S., and drawing all reasonable inferences in his favor, we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact to warrant a trial on the merits. *Id.* On appeal, J.S. contends that the federal "borrowing" doctrine does not authorize the application of the Virginia timely-notice provision to his federal claim under the Rehabilitation Act. Secondly, J.S. challenges the denial of his claim for monetary damages under § 1983. We address each issue in turn.

### III.   Rehabilitation Act

A.   Analytical Framework of Federal "Borrowing" Doctrine

"[F]ederal law is frequently 'deficient' in that it does not supply the complete legal framework necessary to the fair adjudication of federal causes of action." *Brown v. United States*, 742 F.2d 1498, 1503 (D.C. Cir. 1984) (en banc). More precisely, "[a]lthough federal law may establish rights, . . . federal law does not always include the procedural or quasi-procedural elements that are generally considered necessary to the fair litigation of its causes of action." *Id.* (internal quotations omitted). Accordingly, when facing deficiencies in federal law, the borrowing doctrine authorizes courts to "look to other sources of law to 'borrow' appropriate provisions." *Id.*

With respect to federal civil rights actions, Congress has expressly codified this common-law borrowing doctrine in 42 U.S.C. § 1988.[10]

---

[10]The text of § 1988 provides, in relevant part, that if a civil rights statute is

> deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is

The statute provides a three-part framework for courts to follow when faced with apparent deficiencies in federal law. Specifically,

> Section 1988 establishes a three-step process for the selection of the appropriate substantive law in civil rights actions. First, it is to be determined whether federal civil rights law is deficient in that it fails to furnish a particular rule; if it is deficient, the most closely analogous state law may fill the vacuum only if it is consistent with the meaning and purpose of constitutional and federal statutory law. If state law is inconsistent, it must be disregarded in favor of the federal common law.

*Bass v. Wallenstein*, 769 F.2d 1173, 1188 (7th Cir. 1985); *see also Wilson*, 471 U.S. at 267 (establishing three-part framework for incorporating state law provisions into federal law).

Relevant to this appeal, the Rehabilitation Act is a federal civil rights statute,[11] and thus the three-step framework provided by § 1988 governs the selection of appropriate state law rules to fill deficiencies in the federal statute. *See McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir. 1994); *Wolsky v. Medical Coll. of Hampton Rds.*, 1 F.3d 222, 223 (4th Cir. 1993); *see also Holmes v. Texas A&M Univ.*, 145 F.3d 681, 684 (5th Cir. 1998) ("The selection of a limitations period applicable to Rehabilitation Act cases is governed by 42 U.S.C. § 1988(a) . . . ."). The district court in this case applied two distinct provisions of Virginia law to J.S.'s federal cause of action under the Rehabilitation Act: (a) the one-year statute of limitations provided by the Virginia Rights of Persons with Disabilities

---

> held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . .

42 U.S.C. § 1988(a) (2005).

[11]Section 504 of the Rehabilitation Act is "commonly known as the civil rights bill of the disabled," *Americans Disabled for Accessible Public Transp. v. Skinner*, 881 F.2d 1184, 1187 (3d Cir. 1989) (en banc), or the "cornerstone of the civil rights movement of the mobility-impaired." *Id.* at 1205 (Mansmann, J., concurring in part and dissenting in part).

Act, and (b) the 180-day notice-of-claim provision contained within the same Virginia statute. We address each decision separately in accordance with the three-step framework established by § 1988.

B.   Statute of Limitations

Under § 1988, we first analyze whether the Rehabilitation Act was deficient for want of a limitations period. *Brown*, 742 F.2d at 1504 ("Because the practice of borrowing presupposes a need to fill a deficiency in the federal scheme, a court must first look to see if there is indeed such a deficiency."). As the Seventh Circuit observed in *Jaworski v. Schmidt*, 684 F.2d 498 (7th Cir. 1982): "State law is to be resorted to in resolving an issue if, *and only if*, federal law is deficient, and if, *and only if*, state law 'is not inconsistent with the constitution and laws of the United States.'" *Id.* at 500 (quoting 42 U.S.C. § 1988(a)) (emphasis added).

The Rehabilitation Act is indeed deficient without a statute of limitations to govern the federal cause of action. In fact, the most common deficiency in a federal statute that triggers the borrowing doctrine is the absence of a limitations period. *Brown*, 742 F.2d at 1505. As the D.C. Circuit observed in *Brown*, "the absence of a statute of limitations is an egregious gap in a cause of action. Whatever the source of a cause of action, *some clear end* to one's liberty to commence suit is necessary." *Id.* (emphasis in original). As a result, the district court was justified in looking to state law to supply an appropriate limitations period for J.S.'s cause of action under the Rehabilitation Act.

With respect to the second and third prongs of the borrowing analysis, we observed in *Wolsky* that "[t]he Virginia Rights of Persons with Disabilities Act was modeled after and is almost identical to the Rehabilitation Act." *Wolsky*, 1 F.3d at 224. Accordingly, we held that it is consistent with federal law to apply the one-year limitations period in the Virginia statute to claims under the Rehabilitation Act. *Id.* at 225. The district court was therefore correct in adopting the one-year limitations period provided by the Virginia statute as the limitations period for J.S.'s federal claim under the Rehabilitation Act.

C.   Notice-of-Claims Provision

As noted earlier, the district court granted summary judgment on J.S.'s Rehabilitation Act claim on the grounds that he failed to comply with the timely-notice provision of the Virginia Rights of Persons with Disabilities Act. The defendants argued, and the district court agreed, that the Virginia notice requirement was applicable to federal claims under the Rehabilitation Act because the notice provision is consistent with the goals underlying the federal statute. Specifically, the defendants contended that Congress enacted the Rehabilitation Act to accomplish objectives that are similar to those advanced by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, a federal statute that requires plaintiffs to provide timely notice of a discrimination claim.[12] The ADA's notice requirement "serves the goal of prompt notification . . . and swift resolution of the conflict." *McCullough*, 35 F.3d at 131. Inasmuch as the Virginia notice requirement serves the same goals,[13] the defendants argued that application of the notice provision to claims under the Rehabilitation Act is consistent with federal law as required by § 1988.

For his part, J.S. contends that the application of the notice requirement to his claim under the Rehabilitation Act is pre-empted by the Supremacy Clause of the United States Constitution.[14] He argues that

---

[12]Claimants under the ADA must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged discriminatory practice. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1). The period is extended to a maximum of 300 days if the plaintiff initially commenced administrative proceedings with a state or local agency. 42 U.S.C. § 2000e-5(e)(1). Plaintiffs must serve notice of this charge upon the defendant within ten days of its filing with the EEOC. *Id.* Significantly, we have observed that "[t]he federal polices behind the ADA and the Rehabilitation Act are similar, since both statutes were enacted, at least in part, to help disabled persons find and maintain employment." *McCullough*, 35 F.3d at 131.

[13]*See Crewe v. Marler*, 319 S.E.2d 748, 749 (Va. 1984) (notice rule enables defendants to "make prompt investigation of tort claims" and "avoid the expense and delay of litigation by making voluntary settlements with claimants.").

[14]The Supremacy Clause provides that:

the imposition of the notice requirement "adds an additional element of proof to [his] federal cause of action," and that the Supremacy Clause forbids state efforts to change or curtail a federal right. Appellants' Br. at 10.

Both parties, however, overlook the threshold analysis required by § 1988: that is, *whether the Rehabilitation Act is deficient without a notice-of-claims provision*. By its terms, § 1988 authorizes the adoption of a particular state rule "if, and only if, federal law is deficient" without it. *Jaworski*, 684 F.2d at 500; *see also* 42 U.S.C. § 1988(a). For the reasons that follow, we are constrained to hold that there is no deficiency in the Rehabilitation Act that authorizes the adoption of a state notice-of-claims provision pursuant to § 1988.

(1) Deficiency Analysis

First, we note that the deficiency established by the lack of a limitations period in the Rehabilitation Act is not, of itself, license to incorporate additional state law into the federal statute. Instead, "we borrow only what is necessary to fill the gap left by Congress." *West v. Conrail*, 481 U.S. 35, 39 n.6 (1987). Thus, the notice-of-claim provision in the Virginia statute must be analyzed independently to determine whether its application to J.S.'s claim under the Rehabilitation Act is permissible under § 1988.

We are not aware of a single court that has held that the Rehabilitation Act is deficient for the lack of a notice-of-claim provision. This is for good reason; such rules are not "necessary to the fair litigation" of the federal cause of action. *Brown*, 742 F.2d at 1503. In *Brown*, for example, the D.C. Circuit held that the federal scheme for litigating

---

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Cont. Art. VI, cl. 2.

*Bivens*[15] claims is not deficient for want of a notice-of-claims provision. *Brown*, 742 F.2d at 1504. The court explained that:

> [A] notice provision has a very different relationship to a cause of action than that of a statute of limitations, tolling provision, or survival rule.
>
> . . . .
>
> While these latter provisions all operate to define the point of repose, after which expectations become settled, the notice of claims provision does something different. Of course, if it is not complied with, and there are no grounds for waiver, it bars an action, and thus it acts to create settled expectations; but this is simply a penalty for noncompliance. The provision's function is to compel notice so that the . . . defendant may investigate early, prepare a stronger case, and perhaps reach an early settlement. The need to apply traditional provisions of repose (statutes of limitations, tolling provisions, and survival rules) remains unchanged, since the notice provision has a purpose that is quite distinct.
>
> . . . .
>
> Because statutes of limitations are such universally familiar procedural aspects of litigation, and because they are so generally understood as essential to a fair scheme of litigation, the judiciary is safe in assuming that Congress intended (or at least would have intended) to limit all congressionally created causes of action by statues of limitations. In other words, the judiciary can safely look at the absence of a limitations provision as a deficiency.
>
> The judiciary is on less secure ground, however, when it limits statutory or common law causes of action with proce-

---

[15]*See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (authorizing claim for damages resulting from the unconstitutional conduct of federal officials acting under color of federal law).

dural rules embodying interests that are not as universally understood to be essential to fair litigation as are the repose interests embodied in traditional statutes of limitations. The absence of such rules in the cause of action cannot as easily be termed a deficiency.

*Id.* at 1506 (footnote omitted). In holding that § 1988 does not authorize the application of notice rules to *Bivens* claims, the *Brown* court observed that this conclusion was also supported by "the overwhelming majority of federal and state courts that have confronted the issue of borrowing notice of claims provisions" under 42 U.S.C. § 1983. *Id.* at 1509-10 (collecting cases).

The fact that *Brown* and the decisions it cites were rendered in the context of *Bivens* and § 1983 actions does not undermine our confidence that the Rehabilitation Act is similarly not deficient without a notice-of-claim provision. The core reasoning of these decisions—that the interests served by notice-of-claim rules are not essential to federal actions—is equally applicable to the Rehabilitation Act. As the Supreme Court in *Felder v. Casey*, 487 U.S. 131 (1988), reasoned:

> Because statutes of limitation are among the universally familiar aspects of litigation considered indispensable to any scheme of justice, it is entirely reasonable to assume that Congress did not intend to create a right enforceable in perpetuity. Notice-of-claim provisions, by contrast, *are neither universally familiar nor in any sense indispensable prerequisites to litigation*, and there is thus no reason to suppose that Congress intended federal courts to apply such rules, which significantly inhibit the ability to bring federal actions.

*Id.* at 140 (internal quotations omitted) (emphasis added).

In this case, the district court never addressed the issue of whether the Rehabilitation Act is deficient for the lack of a notice-of-claims provision. Instead, the district court held that *Board of Regents v. Tomanio*, 446 U.S. 478 (1980), requires the application of the notice provision to J.S.'s claim under the Rehabilitation Act. In *Tomanio*, the Supreme Court held that when a federal court borrows a state limita-

tions period pursuant to § 1988, it must also apply the state's rule for *tolling* the statute of limitations. *Tomanio*, 446 U.S. at 484-85. The Supreme Court reasoned that rules for tolling a statute of limitations are such "an integral part of a complete limitations policy," that it would make little sense not to incorporate these rules when a limitations period is borrowed pursuant to § 1988. *Id.* at 488. In particular, *Tomanio* explained that:

> Any period of limitation is understood fully only in the context of the various circumstances that suspend it from running against a particular cause of action. . . . In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application.

*Id.* at 485-86 (internal quotations omitted).

The Supreme Court's rationale in *Tomanio*, however, does not support the application of the Virginia notice rule to federal claims under the Rehabilitation Act. This is because "a notice provision has a very different relationship to a cause of action than that of a statute of limitations, tolling provision, or survival rule." *Brown*, 742 F.2d at 1506. "While these latter provisions all operate to define the point of repose," *id.*, a notice rule enables defendants to "investigate early, prepare a stronger case, and perhaps reach an early settlement." *Felder*, 487 U.S. at 142 (quoting *Brown*, 742 F.2d at 1506). These are legitimate goals, to be sure, but very different from those fostered by a statute of limitations. As a result, unlike the tolling provision at issue in *Tomanio*, there is no basis for characterizing a notice-of-claim requirement as "an integral part of a complete limitations policy." *Tomanio*, 446 U.S. at 488. Therefore, because a notice requirement functions independently and serves different purposes than a statute of limitations, *Brown*, 742 F.2d at 1506, we conclude that *Tomanio* does not support the incorporation of such rules into federal actions pursuant to § 1988.

(2)   Consistency Analysis

Our conclusion that the Rehabilitation Act is not deficient for want of a notice-of-claim requirement, by itself, precludes the application

of the notice provision to J.S.'s claim under the Rehabilitation Act. *Jaworski*, 684 F.2d at 500 (state law borrowed only where federal law is deficient). Nevertheless, we discuss the remaining steps of the analytical framework under § 1988 to demonstrate that the application of the notice requirement in this case would contravene an important federal interest.

As noted earlier, the defendants contend that the purposes served by the Virginia notice rule are consistent with the goals underlying the Rehabilitation Act. This contention alone, however, does not support the application of the notice requirement to federal claims under the Rehabilitation Act. The notice requirement may serve objectives similar to the those advanced by the federal statute; however, a state-law provision that is incompatible with the Constitution is not subject to borrowing under § 1988. *Bass*, 769 F.2d at 1188 (Section 1988 authorizes the adoption of state law "only if it is consistent with the meaning and purpose of constitutional *and* federal statutory law.") (emphasis added).

For the reasons that follow, we conclude that the application of the notice requirement to claims under the Rehabilitation Act would contravene the Supremacy Clause. Under Virginia law, the notice provision is not merely a procedural requirement, but instead an *essential element* of the plaintiff's cause of action and a *condition precedent* to any right of action against the defendant. *See Daniel v. City of Richmond*, 100 S.E.2d 763, 765 (Va. 1957) ("[T]he giving of the required notice is mandatory and is an essential element of the plaintiff's case, which he must allege and prove."); *see also Breeding ex rel. Breeding v. Hensley*, 519 S.E.2d 369, 373 (Va. 1999) (construing timely-notice provision as condition precedent to right of action).

This characterization precludes any attempt to incorporate the notice provision into federal law pursuant to § 1988, since borrowing such a requirement would engraft state-law elements upon a federal statute in violation of the Supremacy Clause. The court in *Brown* made this very observation in distinguishing the effect of borrowing a state statute of limitations under § 1988 from the adoption of a state notice-of-claims provision. Specifically, the court reasoned that we may

safely posit that federal lawmakers, when setting out the elements of a cause of action, do not usually intend that there should forever remain a remedy available once those elements are established. It is much more difficult to assume that those lawmakers, when they set out the elements of a federal cause of action, would normally intend for additional and unstated elements to be also considered necessary, and for state law to be consulted to supply those missing (yet necessary) elements of the federal action. *In particular, nothing in federal borrowing doctrine leads us to believe that state law can precondition the accrual of federal rights of action.*

*Brown*, 742 F.2d at 1508 (emphasis added) (internal citations omitted). "State law is not usually thought to add elements to federal rights of action." *Id.* Nor did Congress "intend to assign to state courts and legislatures a conclusive role in the formative function of defining and characterizing the essential elements of a federal cause of action." *Wilson*, 471 U.S. at 269. The application of the Virginia notice requirement to J.S.'s federal claim under the Rehabilitation Act would contravene the Supremacy Clause, and therefore § 1988 does not authorize the borrowing of the notice provision in this case.

Ultimately, because § 1988 does not authorize the application of the Virginia notice requirement to J.S.'s claim under the Rehabilitation Act, the district court's order granting summary judgment to the defendants on Count II of the Complaint was erroneous.

### IV.   42 U.S.C. § 1983

Finally, we address J.S.'s attempt to recover money damages under § 1983 for the defendants' admitted violation of the IDEA. We clearly disapproved of this practice in *Sellers*, observing that the IDEA's comprehensive remedial scheme "demonstrated Congress' intent that disabled children pursue claims to a free appropriate public education solely through the remedial mechanisms established by the statute." *Sellers*, 141 F.3d at 529 (citing *Smith v. Robinson*, 468 U.S. 992, 1009 (1984)). Accordingly, we held that "parties may not sue under section 1983 for an IDEA violation." *Sellers*, 141 F.3d at 529.

J.S. contends that notwithstanding our holding in *Sellers*, our decision in *Robinson v. Pinderhughes*, 810 F.2d 1270 (4th Cir. 1987), authorizes his claim for damages under § 1983. We disagree. Although we permitted the plaintiffs in *Pinderhughes* to file a § 1983 action to enforce an administrative order under the Education of the Handicapped Act ("EHA"),[16] 20 U.S.C. § 1400 *et seq.* (1987), the factual circumstances underlying our decision in *Pinderhughes* are entirely different from the facts of the present case.

After failing to obtain special education services from the Baltimore City Public Schools, the plaintiffs in *Pinderhughes* requested a due process hearing pursuant to the EHA. *Pinderhughes*, 810 F.2d at 1271. A hearing officer found that the city failed to comply with various requirements of the EHA and accordingly rendered a decision in the plaintiffs' favor. *Id.* The city, however, refused to comply with the administrative order. *Id.* The EHA contained no provision for the enforcement of the order, and thus the plaintiffs were "left with a favorable final administrative decision which they [were] powerless to enforce upon the city." *Id.* at 1273.

On the basis of these facts, we concluded that the EHA lacked an enforcement mechanism for the plaintiffs to secure the rights they had already won in the administrative proceeding. Accordingly, we authorized the plaintiffs to secure the city's compliance with the order by means of a civil rights action under § 1983. In particular, we held that

> while the EHA was available to the child to have his substantive rights established, it was not available to him to have them enforced. Thus, . . . the plaintiffs [are] permitted to pursue their remedy under § 1983 for deprivation of a right secured by the laws of the United States. Any constitutional right which the plaintiffs had was decided favorably to them in the administrative proceeding. The right which they seek to enforce here is to have the substantive decision in their favor carried out.

---

[16]"The IDEA was originally named the Education of the Handicapped Act, until renamed in 1990." *Doe v. Boston Pub. Schs.*, 358 F.3d 20, 23 n.2 (1st Cir. 2004).

*Id.* at 1274-75.

Our holding in *Pinderhughes* resulted from the unusual circumstance in which a defendant openly flouted an administrative order under the EHA. For this reason, we carefully observed that the general prohibition against seeking damages under § 1983 for an IDEA violation remained intact:

> Our decision is not approval of an end run around the EHA in order to circumvent or enlarge the remedies available under the EHA. The plaintiffs in fact did proceed under the EHA until the city simply declined to enforce the final decision of the hearing officer. At that point, and not before, plaintiffs were entitled to rely upon § 1983.

*Id.* at 1275 (citation omitted).

By contrast, the present action under § 1983 is precisely the kind of "end run" around the IDEA that we warned against in *Pinderhughes*. Unlike the situation in *Pinderhughes*, in which the plaintiffs achieved a victory under the EHA but were powerless to enforce it, the defendants in this case have not only conceded their violation of the IDEA, but have tendered to J.S. all forms of relief that he was entitled to receive under the statute, including: (1) an agreement to comply with all applicable provisions of the IDEA concerning J.S.'s right to a free and appropriate public education; and (2) an award of costs and attorney's fees. Having obtained exactly what he was entitled to receive under the IDEA, J.S. cannot reasonably maintain that a deficiency in the statute's remedial scheme justifies an enforcement action under § 1983.

## V.

We conclude that the district court erroneously held that J.S.'s claim under the Rehabilitation Act is barred on account of his failure to comply with the timely-notice provision of Va. Code Ann. § 51.5-46(B). However, we agree with the district court that his claim under 42 U.S.C. § 1983 is foreclosed by our holding in *Sellers*. Accordingly, the order granting summary judgment for the defendants on Counts II and III of the Complaint is

*REVERSED IN PART, AFFIRMED IN PART,*
*AND REMANDED.*

TITUS, District Judge, concurring:

I agree that the 180-day notice-of-claim provision under the Virginia Rights of Persons with Disabilities Act may not be applied to bar J.S.'s Rehabilitation Act claim. However, I am concerned that our decision may be misconstrued, albeit incorrectly, as endorsing the exposure of a school system to separate liability under the Rehabilitation Act where, at least under the circumstances of this case, it may be inappropriate in light of the intent of Congress in enacting the IDEA. Because of the procedural posture in the proceedings below, the issue of potential liability under both the Rehabilitation Act and the IDEA was not addressed or decided. Therefore, it would not be appropriate for this Court to do so prior to a decision by the district court. Nevertheless, I write separately in order to bring the issue to the attention of the district court for its consideration on remand.

The district court should consider whether Congress' intent would be furthered by subjecting the school system to additional damages under the Rehabilitation Act, after it has admitted its liability under the IDEA and J.S. has been afforded relief under the IDEA to remedy that violation. As noted above, we cautioned in *Pinderhughes* that a §1983 action could not be used to perform an "end run" around the IDEA. *Pinderhughes*, 810 F.2d at 1275. In *Sellers*, we observed that the intent of Congress was that the remedial mechanisms established by the IDEA be pursued solely under its provisions in the absence of bad faith or any gross misjudgment sufficient to support a claim of discrimination under the Rehabilitation Act. *Sellers*, 141 F.3d at 529. Similar concerns may exist in this case and I believe that they should be addressed by the district court on remand. Unless the district finds bad faith or gross misjudgment, I see little basis for separate liability under the Rehabilitation Act.

The interplay between the IDEA and the Rehabilitation Act was addressed in *Smith v. Robinson*, 468 U.S. 992 (1984), where the Supreme Court affirmed the First Circuit's ruling that when a plaintiff brings an action under both the EHA (the predecessor of the IDEA) and the Rehabilitation Act, that plaintiff cannot obtain attorneys fees

because the EHA does not provide for such payment.[1] *Id.* at 1019-21. Significantly, the Court held that

> it is only in the EHA that Congress specified the rights and remedies available to a handicapped child seeking access to public education. Even assuming that the reach of §504 is coextensive with that of the EHA, there is no doubt that the remedies, rights and procedures Congress set out in the EHA are the ones it intended to apply to a handicapped child's claim to a free appropriate public education.

*Id.* at 1019. In the wake of *Smith v. Robinson*, circuit courts rendered decisions consistent with this clear opinion. *See Doe v. Maher*, 793 F.2d 1470, 1479-80 (9th Cir. 1986); *Georgia Ass'n of Retarded Citizens v. McDaniel*, 740 F.2d 902, 902 (11th Cir. 1984).

Effective August 5, 1986, Congress amended 20 U.S.C. §1415. The amendment changed 1415(f), to state: "Nothing in this title shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of handicapped children and youth[.]" The Fifth Circuit concluded that "Congress read the Supreme Court's decision in *Smith* and acted swiftly, decisively, and with uncharacteristic clarity to correct what it viewed as a judicial misinterpretation of its intent." *Fontenot v. Louisiana Bd. of Elementary and Secondary Educ.*, 805 F.2d 1222, 1223 (5th Cir. 1986). Currently, this "rule of construction" is codified in 20 U.S.C. §1415(l).

Upon remand, I believe that the district court should consider this provision of the IDEA and its application in cases where a plaintiff has been accorded relief under the IDEA. One district court has found that when a plaintiff's claims "only challenge the adequacy of special education services . . . [those] claims are squarely within the ambit of IDEA, which provides the sole remedy. The Rehabilitation Act claim is redundant of the IDEA claim." *Chuhran v. Walled Lake Consolidated Schools*, 839 F. Supp. 465, 475 (E.D. Mich. 1993). Other dis-

---

[1] Unlike the predecessor EHA, the IDEA now authorizes an award of attorneys fees. *See* 20 U.S.C. §1415(i)(3)(B).

trict courts agree. *See Ft. Zumwalt School Dist. v. Missouri State Bd. of Educ.*, 865 F. Supp. 604, 606-07 (E.D. Mo. 1994); *Swift v. Rapides Parish Public School System*, 812 F. Supp. 666, 668 n.1 (W.D. La. 1993); *Carey v. Maine School Administrative Dist. #17*, 754 F. Supp. 906, 923 (D. Maine 1990) (stating in dictum that "plaintiffs may not use the general remedial provisions of the [Rehabilitation Act] to expand the scope of the remedies which are available under the [EHA]. Plaintiffs may use the [Rehabilitation Act] only to pursue those remedies available under the [EHA].").[2]

There are, however, district courts that have read the amendment to the IDEA to evince Congress' intent "to provide that the EHA is not an exclusive remedy, overruling *Smith*." *Silano v. Tirozzi*, 651 F. Supp. 1021, 1024 (D. Conn. 1987). And, at least one district court did permit recovery under both the Rehabilitation Act and the IDEA. *P.N. v. Greco*, 282 F. Supp. 2d 221 (D.N.J. 2003). Unfortunately, the opinion in *Greco* did not discuss the interplay between these two statutes and merely stated, in conclusory terms, that "the requirements imposed under §504 substantially duplicate those provided under the IDEA[,] . . . [a]ccordingly, [two of the defendants] are liable under §504 on the same theories that render them liable under the IDEA." *Id.* at 241 (citation omitted).

Upon remand, I believe that the district court should consider these cases and the issue of whether, in the absence of bad faith or gross misjudgment, a separate and additional remedy under the Rehabilitation Act is appropriate when relief is awarded under IDEA.

---

[2]*Chuhran* and *Ft. Zumwalt School Dist.* both rely on *Smith* for the proposition that "the United States Supreme Court held that where the IDEA provides a remedy, it is the exclusive avenue for redress." *Chuhran*, 839 F. Supp. at 475; *see Ft. Zumwalt School Dist.*, 865 F. Supp. at 606-07 ("[P]arents cannot rely on §504 of the Rehabilitation Act for damages unavailable under IDEA."). Although these cases were decided well after the amendment to §1415(l), neither addresses Congress' reaction to *Smith* and the subsequent amendment.